LA SALLE NATIONAL BANK *et al.*, Plaintiffs and Counterdefendants-Appellants and Cross-Appellees, v. 850 DE WITT PLACE CONDOMINIUM ASSOCIATION, Defendant and Counterplaintiff-Appellee and Cross-Appellant.

First District (6th Division)   No. 1—93—1234

Opinion filed February 4, 1994.

Mayer, Brown & Platt, of Chicago (Michael J. Gill, of counsel), for appellants.

Ash, Anos, Freedman & Logan, of Chicago (Bruce T. Logan, of counsel), for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

Plaintiffs-appellants (plaintiffs) hold title to a garage which adjoins the 850 De Witt condominium building in Chicago, Illinois. When the building was converted from apartments to a condominium, the developer severed the garage from the building and sold it as a separate unit. The garage was sold at a private auction sale in 1979 but later sold to plaintiffs. The plaintiffs subsequently brought suit against the 850 De Witt Condominium Association (Association) to enjoin it from using three areas of the property that were included in the legal description of the garage. The Association counterclaimed for reformation of the legal description on the grounds of mutual mistake.

In 1989 the trial court granted summary judgment for the Association which was reversed by this court and remanded for further proceedings. *La Salle National Bank v. 850 De Witt Condominium Association* (1991), 211 Ill. App. 3d 712, 570 N.E.2d 606.

At the trial on remand, the parties stipulated that the three disputed areas were within the legal description of the garage and that the Association did not have title to the three areas. Therefore, trial was held only on the Association's counterclaim for reformation. The trial court again found in favor of the Association and entered a judgment order for reformation of the legal description as to two of the disputed areas and a perpetual easement as to the third area. The issues on appeal are: (1) whether the trial court erred in granting reformation of the declaration of condominium ownership to include the bicycle room and storage area; and (2) whether the trial court erred in granting a perpetual easement as to the boiler room area. The Association has also filed a cross-appeal on the issue of whether the remedy of a perpetual easement is incomplete.

The building located at 850 De Witt was built in 1978 as a 22-story residential tower with a fully integrated three-story garage, which consisted of one floor below ground and two floors above ground. The beneficial owner of the building was Mid-Continental Realty Co. (Mid-Continental). Paul Reynolds, the president of Mid-Continental, arranged for the conversion of the building to a condominium and for the sale of the garage as a separate unit. Reynolds

testified at trial that it was his intent that the garage as severed contain those areas necessary to operate a parking garage such as the parking spaces, ramps and a small office. The condominium contained the remaining areas which were used by the residents of the building.

Robert Matanky, an accountant and real estate broker, investigated the purchase of the garage which was being offered at a private auction, and he visited the facility on three occasions. At the trial, he testified that the areas he visited were the three stories of the garage. He also stated that he did not go to any area of the residential tower except the lobby. He testified at the trial that it was his intent to purchase the garage containing the parking areas, ramps, and a small office, but he did not intend to purchase any area used by the condominium. He also recognized that there was no heating plant in the garage and that he would need to purchase heat from the condominium.

Mid-Continental hired Nicholas Raimondi of the National Survey Service to prepare a legal description of the property by dividing it into a tower and a garage. Raimondi planned to do this by following the outside walls of the condominium tower on the south and west. He was unable to follow the line of the south wall of the tower so he allowed for an area of undercut to accommodate the garage which lay partially beneath the tower. On the west, he was able to use a delineating line down the west tower wall. Raimondi's delineating line severed 20 of the lockers from the locker room, one-third of the bicycle room from the rest of the area, and part of the boiler room from the basement boiler area.

A copy of the offer to purchase at private auction (Offer to Purchase) defines the property to be purchased as that contained in the legal description of the garage and also states that the property is under lease as a parking garage to Near North Parking Systems. Also included with the offer to purchase was a utility sharing agreement which disclosed that the heating system was in the condominium portion of the building.

After purchasing the garage, Matanky leased the property to Ganser-Oguss Parking, Inc. (G.O. Parking), until 1984 when he sold the beneficial interest in the property to G.O. Parking, which subsequently assigned its interest to Gerald Oguss.

The three areas in dispute are: (1) a blocked-off area in the northwest corner of the ground floor of the garage which the Association uses as a bicycle room (bicycle room); (2) an area over the entrance ramp from the street to the second level of the garage which contains 18 to 20 of the Association's 220 storage lockers (storage area); and

(3) an area in the basement of the garage beneath the ramps which contains fire prevention equipment for the garage and Association (boiler room area).

■ Plaintiffs first contend that the trial court erred in granting reformation of the condominium declaration to include two of the disputed areas because the Association failed to present sufficient evidence of the necessary elements for reformation based on mutual mistake.

> "In order for a written instrument to be reformed, the party seeking reformation must prove that there has been a meeting of the minds which resulted in an actual agreement between the parties, and that when the agreement was reduced to writing and executed, an agreed-upon provision was omitted or one not agreed upon was inserted as a result of the mutual mistake of the parties." (*La Salle National Bank v. 850 De Witt Condominium Association* (1991), 211 App. 3d 712, 715, 570 N.E.2d 606.)

(See also *La Salle National Bank v. Kissane* (1987), 163 Ill. App. 3d 534, 540-41, 516 N.E.2d 790.) The party seeking reformation must prove these elements by clear and convincing evidence. *Briarcliffe Lakeside Townhouse Owners Association v. City of Wheaton* (1988), 170 Ill. App. 3d 244, 251, 524 N.E.2d 230.

Plaintiffs contend that the Association did not meet its burden of proof as to the required elements of reformation because it failed to show that Reynolds and Matanky had any prior agreement or meeting of the minds beyond the terms of the offer to purchase at private auction or that a mistake occurred by which the writing did not reflect their actual agreement.

However, the trial court concluded that the Association did prove the elements of reformation by clear and convincing evidence. Therefore, on appeal, plaintiffs must prove that the trial court's judgment that the clear and convincing standard was met was against the manifest weight of the evidence. See *Novak v. Smith* (1990), 197 Ill. App. 3d 390, 398, 554 N.E.2d 652, in which the court stated:

> "The question whether plaintiff has presented sufficient evidence to meet his burden of proof and overcome the presumption that the instrument as written expresses the parties' true intention is primarily a question of fact, and we will not disturb the trial court's decision unless it is against the manifest weight of the evidence."

In order to show that the trial court's decision is against the manifest weight of the evidence, plaintiffs must show that a conclusion contrary to that reached by the trial court was clearly apparent. *Biggs v. Department of Registration & Education* (1979), 70 Ill. App. 3d 874, 877, 388 N.E.2d 1099.

In the case *sub judice*, the determination as to whether reformation was proper is based on whether it was the intent of Matanky and Reynolds that the garage property only include those areas used for its operation such as the parking spaces, ramps, and office. Evidence of the parties' intent can be found in their trial testimony, conduct, as well as several documents.

In his trial testimony, Reynolds stated that although he hired the surveyor, he did not check the legal description prepared by Raimondi. He further stated that at the time of the conversion, he did not intend to change any of the amenities that were available to the current residents. In response to the trial court's inquiry, Reynolds specifically stated that he was going to give the condominium owners use of the bicycle room as well as the storage lockers when they purchased their units. He also testified that when he sold the garage, it was his intention only to sell that part of the garage which was used for parking. It was not his intent that the legal description of the garage include one-third of the bicycle room, 20 storage lockers, or a portion of the boiler room. His testimony at trial as to his intent was also consistent with his deposition testimony which, as this court observed in *La Salle National Bank* (211 Ill. App. 3d at 717), presented ample evidence that when Reynolds sold the garage to Matanky, he intended to sell only those areas used for the operation of the garage as a parking facility.

Matanky testified at the trial that he saw the document identified as "Terms and Conditions Governing Auction" in conjunction with his purchase of the garage and agreed that the document described the garage as a three-story parking facility with one story in the basement and two at ground level. Matanky further testified that he knew the building had been converted to a condominium, and he did not intend to purchase any part of the residential area. In preparation for his bid on the property, Matanky determined the number of parking stalls and the condition of the facility. Although Matanky made three visits to the facility, he did not recall any basement boiler room or storage area. He did see a bicycle room but did not consider it part of the property he was purchasing. He also stated that he did not take any measures to verify what the legal description of the garage encompassed, but testified that he understood it to consist of the floor space to park cars, the ramps for access in and out of the garage, and a small office. When questioned by the court regarding the boiler room, Matanky stated that he did not know anything about it, but that heat for the garage was purchased from the Association on a monthly basis.

Evidence of the respective parties' intent can also be found in

their conduct at the time of the conveyance. The unit owners have had exclusive access and possession of the three disputed areas either individually or through the staff of the residential tower since the conversion in 1978 and Matanky, his tenants and successors in interest, were excluded. During the time that Matanky operated the facility, he did not ask the Association to pay rent for its use of the three areas.

In addition to the parties' conduct, there is documentary evidence of their intent. The terms and conditions governing auction document describes the property being offered for sale as:

"[I]mproved with a three-level parking garage constructed in such a way that the legal description for the basement level differs for the levels at different grades. The garage was constructed in conjunction with and adjoining the 22-story, 215 unit brick building of the 850 DeWitt Condominium as described in the offer. The structure has spaces striped for 119 cars."

The document makes no reference to the inclusion of part of the locker storage room, part of the bicycle room, or part of the boiler room containing the sump pumps and fire protection equipment but does mention such items as an automobile battery charging unit, electric door operators, and a time card clock. Another document which is evidence of the parties' intent was the "Offer to purchase" which incorporated by reference the "Utility Sharing Agreement." In its preamble, the utility sharing agreement describes the division of the condominium tower and the garage by the condominium declaration and further states that the tower was submitted to the Condominium Property Act (see Ill. Rev. Stat. 1987, ch. 30, par. 301 *et seq.*) and that the remaining portion of the property was a three-level garage providing off-street parking to the condominium owners. The utility sharing agreement describes a steam heating system located on the condominium property which provides heat to the garage. The oil tank which is part of the heating system is located in the basement boiler room which is one of the disputed areas. The utility sharing agreement is evidence that the parties did not intend that the boiler room be included as part of the sale of the garage.

Plaintiffs argue that there was no evidence supporting reformation on the grounds of mutual mistake because there was no evidence of any negotiations or conversations between Matanky and Reynolds prior to the auction sale. Therefore, there was no evidence of a prior agreement other than that contained in the documents for the auction sale. This argument was raised by plaintiffs and rejected by this court in *La Salle National Bank* (211 Ill. App. 3d at 716-17) because it was found to be conclusory and without supporting evi-

dence. While plaintiffs in the case *sub judice* cite to the trial transcript in support of their argument, the evidence they rely on does not provide the support they maintain. Thus, although plaintiffs claim that Reynolds did not intend to exclude the disputed areas from the sale of the garage property because he did not know of their existence or location, Reynolds testified that even though he did not know the exact location of the areas, it was his intention to retain them as condominium property. Plaintiffs also claim that what Matanky understood he was purchasing was consistent with the legal description of the garage. Again, plaintiffs' citation of Matanky's trial testimony is selective. Matanky believed he was purchasing the garage which is included in the legal description. However, he also testified that what was included in the facility were the parking stalls, ramps and a small office and although he saw pipes in the garage, he understood that the heating system was part of the condominium property.

■ In sum, while the parties may not have had conversations or negotiated the terms of the sale prior to the conveyance, there was other evidence that Reynolds and Matanky were in agreement as to what they understood was being conveyed and, further, that it was contrary to what was actually conveyed when the transaction was reduced to writing. In addition, the cases plaintiffs rely on provide no support for their argument and are factually distinguishable. Other than plaintiff's references to the trial testimony of Matanky and Reynolds, which we find unpersuasive, the only other evidence in support of their argument is the legal description of the two properties. The supreme court in *Smith v. Grubb* (1949), 402 Ill. 451, 462, 84 N.E.2d 421, which considered the construction of a deed, stated that more than the legal description of the property should be considered:

> "The circumstances attending the transaction, the situation of the parties, the objects which they had in mind, as shown by the deed, as well as those they did not have in mind and could not attain, merit consideration in construing deeds."

For the aforementioned reasons, we conclude that the trial court's judgment that defendant met its burden of proof based on the clear and convincing standard was not against the manifest weight of the evidence.

■ Plaintiffs next contend that the trial court erred in granting a perpetual easement as to the boiler room area because the Association failed to prove that its use of the area prior to the conveyance was apparent and obvious or that use of the disputed area was necessary to the Association. The elements to establish an easement by implication are addressed in *Granite Properties Ltd. Partnership v.*

*Manns* (1987), 117 Ill. 2d 425, 512 N.E.2d 1230. The court divided easements by implication into two types, easements by necessity and easements implied from preexisting use. (*Granite Properties Ltd. Partnership*, 117 Ill. 2d at 435.) As to easements implied from preexisting use, the court identified three elements: (1) common ownership of the claimed dominant and servient parcels and a subsequent conveyance or transfer separating that ownership; (2) before severing the property, the common owner used part of the united parcel for the benefit of the other part, and this use was apparent, obvious, continuous and permanent; and (3) the claimed easement is necessary to the enjoyment of the parcel conveyed or retained by the granter or transferor. (*Granite Properties Ltd. Partnership*, 117 Ill. 2d at 437.) The Association contends that the trial court's judgment granting it a perpetual easement was proper because the required elements have been satisfied. While plaintiffs concede that the first element has been met, they argue that the Association's use of the basement area at issue was not obvious because access to the area was restricted to the building's janitorial and management staff. However, Matanky testified that he saw pipes running into the basement and that heat was being supplied to the garage by the Association. In its findings, the trial court concluded that Matanky had knowledge of the existence of a heating plant in the basement even though he did not have access to it. As the court stated:

> "They all have to know that there is a heating plant. If you don't see a heating plant, it must be below grade. So they all knew there was some sort of heating. An apparatus below grade."

In *Frantz v. Collins* (1961), 21 Ill. 2d 446, 173 N.E.2d 437, the supreme court held that the doctrine of implied easement was designed "to give effect to the actual intent of the parties as shown by the facts and circumstances of a particular case." (*Frantz*, 21 Ill. 2d at 449.) The court further stated that the defendant did not have to actually see the use but only that it be apparent.

Plaintiffs argue that the Association must meet a strict standard of necessity, referring to *Granite Properties Ltd. Partnership* (117 Ill. 2d at 439-40), where the court stated that "the degree of necessity required to reserve an easement by implication in favor of the conveyor is greater than that required in the case of the conveyee." Plaintiffs claim that the Association failed to prove that the basement area was necessary to its being able to operate. They argue that, based on the cross-examination testimony of Austin Stoll, the Association does not use or need the area because the oil storage tank is not used for the regular heating system, which is gas heat, and the sump pumps in the area could be relocated.

However, regarding the required degree of necessity, the supreme court in *Granite Properties Ltd. Partnership* (117 Ill. 2d at 440) also stated:

> "Thus, when circumstances such as apparent prior use of the land support the inference of the parties' intention, the required extent of the claimed easement's necessity will be less than when necessity is the only circumstance from which the inference of intention will be drawn."

Because the court's finding that the Association's use of the area was apparent to the plaintiffs was not against the manifest weight of the evidence, the Association is not required to show the higher standard of necessity as plaintiffs allege.

The Association claims that its continued use and access to the area is necessary because it is where mechanical equipment is located which is needed to service the residential tower, such as the fire control system consisting of a motor pump, electrical controls, and a smaller pump that keeps the system filled with water. This services the standpipe system for the tower where 210 condominiums are located. The disputed area also contains the sump pump system which provides flood control to the building.

■ At the conclusion of the trial, the court found that the basement area, unlike the other two disputed areas, was an area which was necessary to the garage as well as the Association because it contained the fire prevention and control equipment as well as the sump pump system. The court further found that because of this shared need, as well as the fact that the area was directly beneath the garage, the ownership of this area should remain with the garage and that the Association should be granted a perpetual easement to use and maintain the area. In its judgment order, the trial court provided access to the Association without compensation to maintain, service, repair and replace equipment including the sump pump system, fire protection system, electrical control box, condense heat return and entry for the main water supply and service as well as related piping and an exit staircase.

We conclude that the evidence supported the trial court's finding that ownership of the third disputed area remain with the plaintiffs and its grant of a perpetual easement in favor of the Association. For these reasons, we reject the Association's contention in its cross-appeal that the grant of a perpetual easement was an incomplete remedy.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McNAMARA and GIANNIS, JJ., concur.